NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 200579-U

NO. 4-20-0579

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 9, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 18JA252 |
| v. | ) | |
| Tommy C., | ) | Honorable |
| Respondent-Appellant). | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding that the trial court's finding of unfitness and termination of respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    In November 2018, the State filed a petition for wardship of L.C., the infant child of respondent, Tommy C. In January 2019, the trial court adjudicated the minor neglected and abused, made her a ward of the court, and placed custody and guardianship with the Illinois Department of Children and Family Services (DCFS). The State filed a petition to terminate respondent's parental rights in January 2020. After separate hearings, in August and October of 2020, the court found respondent to be an unfit parent and that it was in the minor's best interests to terminate respondent's parental rights.

¶ 3    On appeal, respondent argues the trial court erred in terminating his parental rights. Specifically, he alleges the court erred in finding he was an unfit parent for failing to (1) maintain

a reasonable degree of interest, concern, or responsibility as to the minor's welfare, (2) make reasonable efforts to correct the conditions that were the basis for the minor's removal from respondent's care, and (3) make reasonable progress toward the return of the minor within nine months following the adjudication of neglect. He also claims the court's best-interest determination was against the manifest weight of the evidence. We affirm.

¶ 4                                  I. BACKGROUND

¶ 5                              A. Neglect Proceedings

¶ 6        On October 14, 2018, DCFS received a hotline call expressing grave concerns about respondent's mental health, drinking, and abusive behavior. According to the caller, she had witnessed the aftermath of an incident when respondent had nailed his wife and L.C.'s mother, Meghann C., to the wall by the skin between her fingers, used a blow torch to burn the Superman logo into her back, and mutilated her nipples. The caller reported that respondent drinks up to a half gallon of vodka per day and believes he is Superman. The caller had witnessed respondent plug in an exposed-wire extension cord to shock himself, while stating that the charge would repel the harmful effects of kryptonite. Based on respondent's bizarre and abusive behavior, the caller feared for the safety of L.C., born October 13, 2018. Respondent denied the allegations but agreed to an intact case, meaning DCFS would monitor a safety plan where Meghann C. and L.C. could live with Meghann's mother without respondent, but he could have supervised visits. By November 7, 2018, the parents were not complying with DCFS's directives, and the infant was taken into protective custody, out of Meghann's care. L.C. remained in her grandmother's home where she continues to reside.

¶ 7        On November 21, 2018, the State filed a petition for adjudication of neglect and abuse. The State alleged L.C.'s environment was injurious to her welfare when she resided with

her parents because of respondent's unresolved substance abuse and mental illness, which caused him to be delusional and abusive. On these same grounds, the State alleged L.C. was an abused minor because her parents created a substantial risk of physical injury to her. We note Meghann C. is not a party to this appeal.

¶ 8        After an evidentiary hearing on January 28, 2019, the trial court entered an adjudicatory order finding L.C. to be neglected and abused within the meaning of the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2018)). On April 10, 2019, the court entered a dispositional order finding it would be consistent with the health, welfare, and safety of L.C. to make her a ward of the court.

¶ 9        Both parents appealed the trial court's adjudicatory and dispositional orders. In a consolidated decision, this court affirmed. See *In re L.C.*, 2019 IL App (4th) 190269-U.

¶ 10                    B. Termination of Respondent's Parental Rights

¶ 11        On January 7, 2020, the State filed a petition to terminate respondent's parental rights. The State alleged he was an unfit person pursuant to Illinois's Adoption Act (750 ILCS 50/1(D) (West 2018)) and identified three grounds supporting its allegation: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to L.C.'s welfare (750 ILCS 50/1(D)(b) (West 2018)), (2) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of L.C. from his care during any nine month period following adjudication of neglect and abuse (750 ILCS 50/1(D)(m)(i) (West 2018)), and (3) he failed to make reasonable progress toward the return of L.C. to his care during any nine-month period following adjudication of neglect and abuse, namely between January 29, 2019, and October 29, 2019, and between April 3, 2019, and January 3, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 12        At the fitness hearing on August 13, 2020, the State presented the testimony of

Roger Fitzgerald-Jackson, the assigned caseworker from Lutheran Child and Family Services (LCFS). He was assigned the case in February 2019, after respondent's case plan had already been developed. Respondent's services included mental health counseling, a substance abuse assessment, and domestic violence services. He was also required to cooperate with LCFS and achieve stability.

¶ 13     According to Fitzgerald-Jackson, respondent participated in mental health and substance abuse assessments early in the case—when it was an intact case. Since that time, and with additional concerns, respondent was referred for a full psychological examination, which was not completed. He blames that partly on respondent's noncompliance and partly on the fact that they were unable to complete the integrated assessment until January 22, 2020, after the petition to terminate was filed. He said respondent cited religious considerations for his "extreme resistance" to drug tests. In approximately April 2020, not during the nine-month period at issue, respondent completed a self-reporting substance abuse assessment, which did not satisfy his case plan requirements. Also, respondent participated in a self-reporting domestic violence assessment, where he claimed no problematic issues and where his history with Meghann C. was not taken into account.

¶ 14     Fitzgerald-Jackson testified respondent stopped visiting L.C. in April or May 2019. He and Meghann C. moved to Ohio in August or September 2019. There, he did not complete any services. They have since moved but, as of the date of the hearing, they did not reside in Illinois. In Fitzgerald-Jackson's opinion, respondent will not comply with recommended services because he minimizes the issues and denies the existence of any problems. According to Fitzgerald-Jackson, respondent had taken no steps forward since the beginning of the case. The State rested.

¶ 15        Meghann C. testified that, while living in Decatur, she was employed as a sleep-lab technician at Decatur Memorial Hospital for 10 years. She said it was "very difficult" to contact the caseworker by telephone but they "finally were able to start communicating via e-mail." She testified that between January 2019 and January 2020, she requested referrals for services, but they did not receive any. They attempted to participate in services on their own. For example, she contacted DOVE in Decatur regarding domestic-violence services, but they referred them back to their caseworker. While living in Ohio, they tried to stay in contact with the caseworker but, according to Meghann, he "never answered his phone or got back with any messages or anything."

¶ 16        On cross-examination, Meghann C. testified she and respondent moved from Illinois in October 2019. When asked why they could not have completed the integrated assessment between January and October of 2019, she blamed it on the January weather, providing no further explanation. She was aware they were required to participate in a full psychological assessment, but she said they never got the referral.

¶ 17        Respondent presented no evidence.

¶ 18        After considering the evidence and arguments of counsel, the trial court found no part of respondent's case plan was successfully completed. The domestic-violence assessments in which he participated were self-reporting and of no value. He failed to undergo a full psychological evaluation as recommended. The court found respondent's goals of stability and cooperation were likewise "never successful." In fact, according to Fitzgerald-Jackson's testimony, not "even any single component of a service plan" was ever rated successful. Further, the court noted Fitzgerald-Jackson's testimony that it was not foreseeable, even if respondent began services, that LCFS could safely return L.C. to respondent in the near future. This was so because respondent "has unaddressed mental health issues as far back as 2011." Respondent "essentially den[ies] that

there's any problem[.]" The court recalled Fitzgerald-Jackson's answer when he was asked if there was any progress or any positives from January 2019 through January 2020. Fitzgerald-Jackson said no; there was no progress, no positives. The court found his testimony to be credible.

¶ 19    Further, the trial court found Meghann C.'s testimony was not credible. The court noted she had failed to provide a reasonable explanation why they could not participate in an integrated assessment between January 2019 and October 2019.

¶ 20    The trial court found the State had proved by clear and convincing evidence respondent was an unfit parent as alleged in the three grounds stated in the petition to terminate.

¶ 21    On October 26, 2020, the trial court conducted the best-interest hearing in respondent's absence, though he appeared through counsel. The State presented the testimony of Fitzgerald-Jackson. He testified he prepared the best-interest report for the court. He noted the address for respondent should be changed to Missouri, rather than Kentucky, as they had again relocated.

¶ 22    Fitzgerald-Jackson testified L.C. was in a prospective adoptive placement with her grandmother, where she has resided since being taken into protective placement. He said L.C. was a "happy, bubbly kid, very smiley." She attended day care, which had some preschool elements to it. She lived with four other children in the home, who refer to her as their sibling; they call her "sissy." Both foster parents are "very active within their own families," they attend church, and "do some community events." In Fitzgerald-Jackson's opinion, it would be in L.C.'s best interest to terminate respondent's parental rights due to his ongoing and unaddressed mental health and substance abuse issues and "the fact that we have an underlying issue of domestic violence that has gone unaddressed."

¶ 23    On cross-examination, Fitzgerald-Jackson testified he reviewed his case aide's

notes regarding recent visitation between respondent and L.C. He said L.C. shied away from respondent. He identified the concern regarding "the child's willingness to approach the parents."

¶ 24 The trial court noted it reviewed the best-interest report, which noted that L.C. was a happy, healthy, and well-developed toddler. She was very integrated into the home with photographs of her displayed on the walls with other family photographs. She was financially secure in the home and has a strong bond with all other family members. She considers her foster parents, who have committed to adoption, to be her "mommy and daddy." The State rested.

¶ 25 Meghann C. testified visits with L.C. had been going "really well." She said she and respondent "make wonderful parents." She asked the court for additional time, claiming there was no domestic violence and no substance abuse issues. She said "[e]verything is, you know, great."

¶ 26 Respondent presented no evidence.

¶ 27 After the arguments of counsel, the trial court indicated it had considered the evidence and the statutory best-interest factors. The court concluded the State had proved by a preponderance of the evidence that it was in L.C.'s best interest that respondent's parental rights be terminated.

¶ 28 This appeal followed.

¶ 29 II. ANALYSIS

¶ 30 Respondent argues the trial court erroneously terminated his parental rights because the court's fitness and best-interest determinations were both against the manifest weight of the evidence. We disagree and affirm the court's judgment.

¶ 31 The Juvenile Court Act of 1987 (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern the termination of a parent's rights to

his or her child. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps in the process. The State must show the parent is an "unfit person" and that terminating parental rights serves the best interests of the child. *Id.* at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998); and the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 1998)). Here, respondent challenges both determinations.

¶ 32        When a parent appeals the trial court's findings that he or she is an "unfit person" and that terminating parental rights is in the best interests of the child, we do not retry the case but, instead, limit ourselves to deciding whether the court's findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). This is a deferential standard of review. A finding is against the manifest weight of the evidence only if the evidence "clearly" calls for the opposite finding (*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)), such that "no reasonable person" could arrive at the trial court's finding on the basis of the evidence in the record (*Prater v. J.C. Penney Life Insurance Co.*, 155 Ill. App. 3d 696, 701 (1987)).

¶ 33        Therefore, we will begin by considering whether it is clearly evident, from the evidence in the record, that the State failed to carry its burden of proof. In other words, is it clearly evident that the State failed to prove, by clear and convincing evidence, that respondent met any one of the three definitions of an "unfit person" cited in the petition to terminate parental rights? See *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994).

¶ 34                                A. Fitness Finding

¶ 35        In its petition to terminate respondent's parental rights, the State alleged that he was an "unfit person" within the meaning of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) in that he, *inter alia*, had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare. In deciding whether a parent's interest in, concern for,

and responsibility toward the child's welfare have been reasonable in degree, the trial court should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as the parent's inquiries into the child's welfare. *Daphnie E.*, 368 Ill. App. 3d at 1064. The court should consider such efforts in the circumstances in which they were made, taking into account any obstacles to visiting the child. *Id.* If circumstances make personal visitation impractical, the court should consider the extent to which the parent showed reasonable interest, concern, and responsibility by other means, such as letters, telephone calls, and gifts to the child, "taking into account the frequency and nature of those contacts." *Id.*

¶ 36        The evidence presented showed respondent stopped visiting with L.C. in April 2019 and voluntarily moved to Ohio in the fall of 2019. His in-person visits did not resume until August 2020, well after the petition to terminate his parental rights was filed. After living in Ohio, he moved to Kentucky and later, to Missouri. He failed to engage in any of his service-plan directives to address his serious, unresolved mental health, substance abuse, and domestic violence issues. The assessments he *did* complete were self-reporting and, therefore, self-serving. Rather than demonstrating *any* interest in L.C.'s welfare, the evidence suggested respondent chose to disregard his parental responsibilities by (1) not visiting with L.C., (2) not working toward reunification, (3) not maintaining any contact with L.C. by sending cards or letters to her, and (4) moving away from L.C. In fact, respondent's actions, or inactions as the case may be, showed he had no interest, concern, or responsibility toward L.C.'s welfare or toward the hope of having his child returned to his care.

¶ 37        By finding that respondent had failed to show a reasonable degree of interest, concern, or responsibility as to L.C.'s welfare, the trial court did not make a finding that was against the manifest weight of the evidence. See *A.W.*, 231 Ill. 2d at 104.

¶ 38        Because meeting only one of the statutory definitions in section 1(D) of the

Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to make the parent an "unfit person,"

we need not discuss the remaining unfitness allegations against respondent. See *In re F.P.*, 2014

IL App (4th) 140360, ¶ 83.

¶ 39                              B. Best-Interest Determination

¶ 40        Once a trial court finds a parent to be an "unfit person," it must then consider the

child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the

parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*,

212 Ill. 2d 347, 364 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating, once

the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the

best interests of the child"). When considering whether termination of parental rights serves a

child's best interests, the trial court must consider several factors within "the context of the child's

age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
>
> the child's identity; (3) the child's familial, cultural[,] and religious
>
> background and ties; (4) the child's sense of attachments, including
>
> love, security, familiarity, continuity of affection, and the least
>
> disruptive placement alternative; (5) the child's wishes and
>
> long-term goals; (6) the child's community ties; (7) the child's need
>
> for permanence, including the need for stability and continuity of
>
> relationships with parent figures and siblings; (8) the uniqueness of
>
> every family and child; (9) the risks related to substitute care; and
>
> (10) the preferences of the person available to care for the child."

> *Daphnie E.*, 368 Ill. App. 3d at 1072. See also 705 ILCS
> 405/1-3(4.05)(a) to (j) (West 2018).

¶ 41 A reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate the court should have reached the opposite result. *Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 42 Respondent contends the trial court ignored evidence that he did what was asked of him from his caseworker. He further argues that he loves his child. Despite respondent's position, the evidence presented at the best-interest hearing demonstrated that L.C. was thriving in her relative foster home. She was receiving the care she needed, she was happy, she had a strong bond with her foster parents and siblings, and she was in a safe, secure, and stable environment. Additionally, the foster home, the only home in which she has resided, was a potential adoptive placement, lending itself to achieving the permanency, safety, and stability she deserved.

¶ 43 When analyzing the statutory best-interest factors, the trial court relied on (1) L.C.'s sense of attachments, including love, security, familiarity, and continuity of affection, and (2) L.C.'s need for permanence, including her need for stability and continuity of relationships with parent figures, with siblings, and other relatives. See *id.*; see also 705 ILCS 405/1-3(4.05)(d), (g) (West 2018). Because the evidence does not lead us clearly to the opposite conclusion, we find the court's best-interest determination was not against the manifest weight of the evidence. See *In re B.B.*, 386 Ill. App. 3d 686, 697-98 (2008).

¶ 44                          III. CONCLUSION

¶ 45          For the reasons stated, we affirm the trial court's judgment.

¶ 46          Affirmed.