NOTICE
Decision filed 01/10/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220565-U

NO. 5-22-0565

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-215 |
| | ) | |
| Frank W., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge, presiding |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Where the trial court's orders finding that Frank W. was an unfit person and that the best interest of the minor child warranted termination of his parental rights were not contrary to the manifest weight of the evidence, we affirm the orders.

¶ 2                         I. BACKGROUND

¶ 3      A.D. is a female child born on April 19, 2006. A.D.'s mother is Holli M., and her father is Frank W.[1] This case began with a hotline report to the Department of Children and Family Services (DCFS) on August 28, 2018. The reporter alleged that Holli was selling drugs out of her residence

---

[1]This case only involves A.D. and her father, Frank. A total of five children were removed from Holli's residence: K.W., a female born on January 25, 2002, A.D., D.M., a male born on February 13, 2012, T.P., a male born on July 7, 2014, and H.M., a female born on August 27, 2015. Frank was alleged to be the father of K.W. and A.D.

1

and that K.W. and A.D. were aware that their mother was selling drugs. The reporter alleged that Holli and her paramour, Travis, were using either methamphetamine or heroin in the presence of the children; that the children have been unable to awaken Holli on several occasions because of her drug usage; and that A.D. walked in on Travis "sniffing" something up his nose. DCFS sent a child protection specialist to Holli's house on the date of the hotline report. Holli admitted to a substance abuse history of prescription narcotics and heroin for which she received treatment. Holli and Travis agreed to submit to urine drug tests, which were positive for amphetamines and methamphetamine. On September 14, 2018, DCFS instituted a safety plan. DCFS removed the children from the home and placed the children with relatives. DCFS directed Holli to complete a substance abuse assessment and to have three negative urine drug tests by September 21, 2018. Holli failed to comply. DCFS then renewed the safety plan extending the deadline for completion of the substance abuse assessment to September 24, 2018. Holli again failed to comply. DCFS took protective custody of A.D. and her siblings on September 26, 2018. DCFS noted that Frank had a pending investigation for an altercation with his daughter, K.W., and was alleged to have substance abuse issues.

¶ 4    On September 28, 2018, the State alleged that A.D. was neglected and abused as Holli and her paramour, Travis, had been abusing substances in A.D.'s presence. On September 28, 2018, the State sought, and DCFS was awarded, temporary custody of A.D. Frank could not be located and so did not receive notice of the shelter care hearing.

¶ 5    By January 2019, the children were returned to Holli's home with supervision. Frank had not been located, and he had not contacted DCFS about his case. DCFS filed status reports with the court in June 2019 and November 2019 indicating that Frank had not been located.

¶ 6    On December 17, 2019, DCFS took the children into protective custody again. The State amended its petition on December 18, 2019, alleging that A.D. was neglected and abused because Holli and her new paramour, Corey, had engaged in domestic violence in A.D.'s presence, that Holli had resumed substance abuse, and that Holli had threatened A.D. if she reported what was transpiring in the household. The paramour, Corey, was on mandatory supervised release for a drug conviction, and his parole status was listed as "absconder." The shelter care report filed by DCFS on December 18, 2019, indicated that Frank was then in the custody of the Department of Corrections at the Vienna Correctional Center. Frank had been in prison since December 19, 2015, for a residential burglary conviction.

¶ 7    The court held the adjudicatory hearing and entered its order on September 9, 2020. Frank received notice by publication. The court adjudicated A.D. as abused and neglected in that she was living in an environment injurious to her welfare. The court held the dispositional hearing on the same date. The court found that Holli was unfit and unable to care for A.D. Frank was found to be unfit, unable, and unwilling to care for A.D. as he was not involved.

¶ 8    DCFS filed its permanency review with the court in December 2020. DCFS stated that a caseworker met with Frank earlier in 2020, but that Frank failed to maintain contact with the caseworker. Frank's whereabouts were again listed as unknown. The permanency goal was to return A.D. home within 12 months. The court's permanency order found that Frank had not made reasonable and substantial progress and had not made reasonable efforts toward returning A.D. home.

¶ 9    DCFS filed a permanency report with the court in June 2021, noting that Frank had been in and out of substance abuse facilities and was currently on probation for possession of a

3

controlled substance. DCFS noted that Frank had been engaging in some visits with A.D. at her foster home.

¶ 10    On June 16, 2021, the court entered a permanency order changing the permanency goal for A.D. to substitute care pending determination of termination of parental rights. The court found that this goal was appropriate because there had been no reasonable and substantial progress by Holli or Frank and that they had also made insufficient efforts toward reunification.

¶ 11    The court held permanency hearings on December 1, 2021, and on March 9, 2022. As of the dates of the hearings, DCFS was again unable to locate Frank. The court maintained the permanency goal of substitute care pending determination of termination of parental rights. The court found that Frank had not made reasonable and substantial progress or reasonable efforts toward the return of A.D. home.

¶ 12    On April 29, 2022, A.D.'s guardian *ad litem* (GAL) filed a motion asking the court to find Frank unfit and to terminate his parental rights. The GAL alleged that Frank was unfit on the following six bases: (1) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) he failed to make reasonable efforts to correct the conditions that formed the basis for A.D.'s removal from the home during any period following the court's adjudication of neglect and/or abuse (*id.* § 1(D)(m)(i)); (3) he failed to make reasonable progress toward return of A.D. to him during any nine-month period following the adjudication of neglect and/or abuse—specifically between September 9, 2020, and June 9, 2021 (*id.* § 1(D)(m)(ii)); (4) he failed to make reasonable progress toward return of A.D. to him during any nine-month period following the adjudication of neglect and/or abuse—specifically between June 9, 2021, and March 9, 2022 (*id.*); (5) he failed to make reasonable progress toward return of A.D. to him during any nine-month period following the adjudication of

neglect and/or abuse—specifically between July 27, 2021, and April 27, 2022 (*id.*); and (6) he was depraved because he had been criminally convicted of three felonies in Illinois with at least one of those three convictions within five years of the date that the petition to terminate his parental rights was filed (*id.* § 1(D)(i)). As Frank's whereabouts were then unknown, the State served him with notice by publication.

¶ 13    The fitness hearing was held on July 27, 2022. Frank did not appear at the hearing but was represented by his attorney. Jennifer Cooper, the DCFS foster care supervisor from December 2021 to the date of the hearing, testified that she was the supervisor for caseworker Lynley Young. Cooper testified that she saw no "forward progress" from any parent in this case. Lynley Young next testified that she was the DCFS case manager from May 1, 2019, to the date of the hearing. Young testified that she met with Frank once at Crossing's Elements where he was engaged in substance abuse rehabilitation. This meeting was held on February 2, 2020. Since that date, Young had no further contact with him. Young had performed diligent searches to locate Frank but was unsuccessful. Young indicated that the primary concern with Frank was substance abuse. Young stated that she did not believe that Frank would be able to safely parent A.D. within a reasonable timeframe. Young indicated that she had seen Frank at a recent court hearing in this case, but Frank did not approach her. The GAL provided the court with certified copies of Frank's Macon County convictions in 2002-CF-406 (unlawful possession of cocaine with the intent to deliver), 2015-CF-1604 (residential burglary), and 2019-CF-1047 (unlawful possession of heroin). At the conclusion of the hearing, the court found that the State had established the six allegations in its petition seeking to have Frank declared an unfit parent.

¶ 14    The court held the best interest hearing on August 24, 2022. Frank did not appear but was represented at the hearing by his attorney. The only witness to testify was caseworker Young.

5

Young testified that A.D. was a teenager and was displaying some "teenage behaviors," but that overall, she was doing well. She was living with her maternal grandmother. A.D.'s brother D.M. was also living in the same home. Young testified that the younger two siblings were placed together in a fictive kin home. The younger two siblings visit with the older siblings on the weekends at the maternal grandmother's home. Young testified that both residential placements are permanent. The maternal grandmother planned to adopt A.D. and D.M. and the fictive kin plans to adopt the younger two siblings, T.P. and H.M. Additionally, the sibling visitation will continue after the adoptions. Young testified that A.D. had been in placement with her maternal grandmother since December 14, 2019. The court stated that it had considered all best interest statutory factors and found that the most pertinent factors were A.D.'s sense of attachment where she feels a sense of security and familiarity, continuity, and the need for permanency. The court also indicated that it considered the best interest report and Young's testimony that the best interest of A.D. would be served by the termination of Frank's parental rights. The court noted the length of time that A.D. had been in her current placement, and that there was a possibility of adoption that would provide additional stability. The court found that the State established that termination of Frank's parental rights to A.D. was appropriate.

¶ 15                                    II. ANALYSIS

¶ 16    Frank appeals from the trial court's orders finding that he was an unfit parent and that his parental rights should be terminated.

¶ 17    The legal authority for the involuntary termination of parental rights in Illinois is found in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2020)) and in the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (citing *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). The procedural basis for the involuntary termination of parental rights

is found in section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2020)). The procedure involves two steps. With step one, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2020); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2); *In re J.L.*, 236 Ill. 2d at 337-38.

¶ 18    On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). The trial court's finding of unfitness is given great deference because it had the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 19    We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Frank was an "unfit person." The trial court determined that the State met its burden of proof on the following basis: he failed to maintain a reasonable degree of interest, concern, or responsibility as to A.D.'s welfare (750 ILCS 50/1(D)(b)); he failed to make reasonable efforts to correct the conditions that formed the basis for A.D.'s removal during any

7

period following the court's adjudication of neglect and/or abuse (*id.* § 1(D)(m)(i)); he failed to make reasonable progress toward the return of A.D. to him during any nine-month period following the adjudication of neglect and/or abuse—specifically between September 9, 2020, and June 9, 2021, between June 9, 2021, and March 9, 2022, and between July 27, 2021, and April 27, 2022 (*id.* § 1(D)(m)(ii)); and he is depraved because he had been criminally convicted of three felonies in Illinois with at least one of the convictions within five years of the date that the petition to terminate was filed (*id.* § 1(D)(i)).

¶ 20    Frank argues that the trial court erred in finding that he was an unfit parent because he had been working to address his substance abuse issues. Frank contends that given these circumstances he had made reasonable progress and reasonable efforts to correct the substance abuse issues that were the basis for A.D.'s removal from the home.

¶ 21    "Reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1067). "The benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *Id.* (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). A parent makes reasonable progress when the trial court can find that the progress "is sufficiently demonstrable and of such a quality" that the trial court may soon be able to order the return of the minor to the parent's custody. *Id.* (citing *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22).

¶ 22    "Reasonable effort" is determined by a subjective standard that refers to the amount of effort which is reasonable for that parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. The court must determine whether the parent has made committed and diligent efforts toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 23    We review Frank's progress pursuant to the standard that includes the parent's compliance with the service plan objectives and the court's orders. *In re C.N.*, 196 Ill. 2d at 216-17. With no interaction with the agency, there was no integrated assessment performed to determine what services Frank required. Although Frank was apparently incarcerated when DCFS removed A.D. from Holli's home due to her substance abuse, DCFS determined that Frank had his own substance abuse issues. While it appears that upon Frank's release from prison, he entered an inpatient substance abuse rehabilitation program, and during that stay, Frank met with his caseworker on February 2, 2020, upon leaving that program, Frank failed to maintain contact and/or provide documentation to his caseworker to support his rehabilitation efforts and progress. Moreover, from the evidence the State filed with the court in support of its claim that Frank was depraved, Frank was convicted of possession of heroin during the pendency of this case.

¶ 24    Here, the only communication DCFS had with Frank was on February 2, 2020—17 months after the State asked the court to find that A.D. was neglected and abused. Frank was in substance abuse rehabilitation at the time of this meeting with caseworker Young. Young testified that she was never able to locate Frank after the February 2020 meeting but noted that Frank was in court for one hearing in 2022. Still, Frank did not reach out to Young to determine what he needed to do to establish that he could be a fit parent for A.D. In total, Frank had one conversation with his

9

caseworker during the many months between the adjudication of neglect and abuse and the GAL's motion to have his parental rights terminated.

¶ 25    In addition to Frank's failure to work with his caseworker, his failure to undergo an integrated assessment, and his failure to participate in recommended services, Frank did not appear in court at the fitness and best interest hearings to provide any defense for his inaction. Accordingly, we find no basis in the record on appeal to conclude that the trial court's determination that Frank was an unfit parent was in error. We conclude that the trial court's finding that Frank was an unfit parent was not contrary to the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 26    Having determined that the trial court correctly found that Frank was an unfit parent, we turn to the best interest of A.D. Termination of a parent's rights is an extreme act. *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). A parent maintains a superior right to raise his or her own children. *Id.* Once a parent has been determined to be unfit, "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. Until the court determines that a parent is unfit, the interests of both the parent and the child are concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship.' " *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 27    After finding that a parent is unfit, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d at 366. On appeal of a best-interest determination, we must decide whether the trial court's decision is contrary to the manifest weight of the evidence. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A

best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 28    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must consider several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2020). These factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as  opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and

11

continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 29    During the best interest hearing, the trial court stated that it had considered all statutory best interest factors and found that A.D.'s security and familiarity, continuity, and the need for permanence were paramount. The trial court may also consider the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170. Here, the trial court concluded that in consideration of all the factors, A.D.'s best interest could only be met by termination of Frank's parental rights. The record provides no specific information about when A.D. last saw Frank. Although DCFS noted that at some point in 2021, Frank engaged in visits with A.D., she was fully integrated into her maternal grandmother's home. The maternal grandmother has stated her intent to formally adopt A.D. Here, the record clearly reflects that termination of Frank's parental rights was the appropriate outcome for A.D. She deserves the permanence and stability that termination would provide. We conclude that the trial court's decision to terminate Frank's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 30                                    III. CONCLUSION

¶ 31    For the foregoing reasons, we affirm the judgments of the circuit court of Macon County.

¶ 32    Affirmed.